UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:10-CV-606-H

EVERETT D. ABNEY                                                                        PLAINTIFF

vs.

LADONNA THOMPSON, et al.                                                        DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Everett D. Abney ("Abney"), filed this *pro se* action on September 24, 2010, while incarcerated at Kentucky State Reformatory ("KSR").  Abney has named as Defendants: LaDonna Thompson, Kentucky Department of Corrections ("KDOC") Commissioner; Lt. Carlos Schantz, Internal Affairs Officer at KSR; Robert Gimmell, Chief Engineer of KSR; Terry Anderson, Engineer at KSR; Glenn Dotson, KSR "CUA 2;" Marvin Brunner, KSR Engineering Supervisor; Frederick W. Kemen, M.D. ("Dr. Kemen"), Roy Washington, APRN ("Nurse Washington"), and Cookie Crews, Warden of KSR.  Abney alleged that Defendant Brunner subjected him to repeated verbal and physical sexual harassment while he was assigned to a work detail.  Abney also alleged that, while on that work detail, he was exposed to "Friable Asbestos and Lead Paint/Dust and Fumes" without proper working materials. Abney set out the period of his alleged exposure to asbestos and lead paint as being from March 28, 2009, through September 28, 2009.  Finally, Abney alleges that unnamed officials in the medical department acted with deliberate indifference to his serious medical needs concerning his reports of exposure to these substances.

Defendants, Dr. Kemen and Nurse Washington, have moved for summary judgment on a variety of Plaintiff's claims under 42 U.S.C. § 1983.  Plaintiff has not responded to the motion.

I.

The relevant facts appear to be these. Abney was a frequent visitor to the KSR medical department and his overall health and medical concerns are well documented. On one occasion he did express concern about exposure to "Friable Asbestos and Lead Paint/Dust and Fumes," in a "Request to See Staff Form." Abney's frequent visits to medical for various other maladies provide an abundance of evidence such as lab work, blood tests, lung sounds, and x-rays, none of which show signs of onset of
disease associated with exposure to asbestos or lead paint/dust.

On September 8, 2009, Nurse Washington saw Abney for knee pain, excessive urination at night and a small rough spot on the right side of his face. He ordered lab work, which included another complete blood count and an abdominal x-ray to look for stones or calcified areas in Abney's kidneys, ureters, and bladder. The x-ray was conducted on September 11. The report states, "There is no soft tissue mass or pathologic calcification. Chest is normal." The radiologist's impression was, "unremarkable abdomen examination." The lab work showed that Abney's red and white blood counts were once again within normal limits, as were his hematocrit and hemoglobin and all other values measured at that time. Nurse Washington saw Abney again on September 23 for follow-up on his labs, and found Abney's labs and radiologic studies to be "unremarkable."

On October 1, 2009, Abney entered a request to see medical staff with complaint of sinus problems, pressure in his ears, headaches and shortness of breath. Medical staff noted that Abney was already scheduled for an appointment on October 13, at which time he was seen by Courtney McGuire, RN ("Nurse McGuire"). Abney's vital signs were within normal

2

limits; his lung sounds were clear with no congestion noted; and that he was already scheduled for an appointment with his care provider.

On October 26, 2009, Abney submitted a request to be screened for exposure to known asbestos and possible lead paint dust. Personnel informed Abney that he already had an appointment scheduled with his care provider and that he should raise the issue at that time. Nurse Washington saw Abney four days later, on October 30, 2009. During this visit, Abney received additional care for the spot on his right cheek. Abney's vital signs were within normal limits. He also complained of knee pain during this visit. The note for this visit contains no information about a complaint of exposure to asbestos or lead paint, or any request to be examined or screened for such exposure. Nurse Washington states in his Affidavit that if Abney had raised these concerns that he would have documented them in the medical record.

On November 16, 2009, Abney submitted another request to see medical staff. He stated that he was having trouble getting medications through the pill call window. He requested that Nurse Washington look into this "ASAP." Nurse Washington saw Abney again on November 19 and December 4, at which times Abney received additional treatment for the spot on his right cheek. Nurse Washington saw Abney again December 8 for evaluation of the spot on his right cheek and his complaint of his leg going to sleep after sitting for 5-10 minutes. Objective findings during this visit included, regular heart rate and rhythm and clear lungs.

On January 7, 2010, Nurse Washington saw Abney for continuing care of his chronic knee pain. Nurse Washington noted during this visit, "He has no complaints and [wishes] to [continue] meds as written." Abney's vital signs were all were within normal limits. On February 19, Abney reported to sick call with complaint of pain in his left testicle for the

3

previous sixteen hours. He was examined and received medication for the complaint.

On March 4, 2010, Abney submitted another request to see medical staff, stating that he needed his medications renewed and that he was still having some problems, though he did not specify what they were. Abney submitted another request to see medical staff on March 9, stating that his medications had been renewed but that he still needed a follow up with Nurse Washington, without further explanation. Medical staff responded that Abney already had a follow-up appointment scheduled the week of March 15. On March 12, Nurse Washington saw Abney again for follow-up for his complaint of testicular pain and painful urination. During this visit, Nurse Washington found Abney's lungs clear and his heart rate and rhythm to be regular.

On March 21, 2010, Abney again requested to see the medical staff, complaining that after starting the medication Doxazosin three nights earlier, he had started to experience rectal bleeding. Nurse Washington saw Abney the next day and requested a consultation for a colonoscopy. Lab work was conducted on March 25 as ordered by Nurse Washington. This lab work also consisted of a complete blood count and complete metabolic panel. Abney's red and white blood counts were once again within normal limits, as were his hematocrit and hemoglobin and all other values measured at that time.

On April 5, 2010, Abney reported to KSR Dorm 12 for preparation for his colonoscopy. His vital signs were normal except for his temperature, which was somewhat low. A follow up note that same day again showed normal vital signs with the exception of temperature. Abney's lung sounds were clear. On April 6, the colonoscopy was performed at Baptist Hospital Northeast. On April 27, Nurse Washington saw Abney for review of the colonoscopy results and management of Abney's chronic bilateral knee pain. At that time, Abney complained of dry

mouth and problems with urine hesitancy.  Nurse Washington ordered that Abney's Oxybutnin be withheld for six weeks due to anticholinergic effects.  Nurse Washington's objective findings were regular heart rate and rhythm and clear lungs.

On July 13, Abney submitted a request to see medical staff, in which he complained of unspecified problems.  Medical personnel responded that Abney was seen by medical provider, Nurse Practitioner Michael Haun ("Nurse Haun").  On July 17, Abney submitted another request to see medical staff in which he complained of abdominal pain "pretty often" and cough when laying down at night.  On July 22, Nurse Haun saw Abney for complaint of chronic pain.  Abney had regular heart rate and rhythm and his lungs were clear.  Nurse Haun noted Abney's complaint of pain, but also noted that his "vital signs are amazingly normal for someone in 'so much pain.'"  On August 5, Nurse Haun ordered a complete blood count, complete metabolic panel and a lipid panel, which were performed.  Abney's red and white blood counts were once again within normal limits, as were his hematocrit and hemoglobin.  In fact, all of Abney's labs were normal with the exception of his BUN/creatinine ratio[9] and his LDL cholesterol.  On November 3, 2010, Nurse Rhonda Harrison ("Nurse Harrison") conducted Abney's annual physical exam.  Abney's vital signs were all were within normal limits. The exam revealed Abney's lungs to be clear with no wheezes with good air movement throughout.  His heart rate and rhythm were regular with no murmur, rubs, or gallops.  Diagnostic tests ordered in conjunction with the exam included labs, EKG, an eye exam and x-ray of his back.  On November 5, Abney underwent a series of lumbar spine x-rays.  The findings were: "Negative lumbar spine series."  A series of thoracic spine x-rays were also performed at this time, and the impression was: "Negative Thoracic Spine Series."

On November 21, Abney submitted a request to see medical staff for follow-up of his annual exam. Medical personnel responded that follow up was not scheduled until after Abney's lab work had been done. On November 30, Abney submitted another request to see medical staff with complaint of "heavy feeling on his chest," chest pains and pain in left arm.

On January 12, 2011, the lab work ordered by Nurse Harrison was conducted and was extremely thorough. Abney's red and white blood counts were both normal, as were his hematocrit and hemoglobin. In fact, all values measured were normal except for Abney's BUN/creatinine ratio, hemoglobin A1c and his LDL cholesterol calc. On January 31, Nurse Harrison saw Abney for follow-up for his lab work and his complaint of chest pain. Abney reported palpations, daily episodes of chest pain that he described as a sharp pain with tingling in arms along with head pressure. Abney also reported a history of GERD. Examination revealed that Abney's lungs were clear, he had regular heart rate and rhythm with no murmur or gallop. Nurse Harrison ordered an EKG for Abney and he was to continue with his current medications. On February 28, 2011, Nurse Harrison ordered that Abney return for follow up if the EKG came back abnormal or if he was not released from custody, as he expected. Abney was released from custody in February of 2011. No further information with regard to the EKG is present in Abney's medical record.

## II.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he or she has the burden of proof. *Id.* Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id.* at 322. If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, *supra.* at 323. The nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. Supp. 214, 217 (E.D. Mich. 1990). The moving party, therefore, is "entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id.* (internal quotation marks omitted).

The standard applied in reviewing the actions of prison doctors and medical staff in this type of case is deferential. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (Third

Cir. 1979). Courts will generally refrain from "second guessing" the adequacy of a particular course of treatment where a prisoner has received some medical attention and the dispute concerns the adequacy of that treatment. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976); *see also White v. Napoleon*, 897 F.2d 103, 110 (Third Cir. 1990); *Christy v. Robinson*, 216 F. Supp. 2d 398, 413-14 (D.N.J. 2002).

### III.

To establish an Eighth Amendment violation premised on inadequate medical care, a prisoner must demonstrate that the defendant acted, or failed to act, with "deliberate indifference to serious medical needs." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Terrence v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002). Thus, to state a cognizable claim, a prisoner must show that the official "acted or failed to act despite his knowledge of a substantial risk of serious harm" to the inmate. *Terrance*, 286 F.3d at 843 (quoting *Farmer*, 511 U.S. at 842). Less flagrant conduct, however, may still evince deliberate indifference where there is "a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment. *Id.* (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). Such grossly inadequate care is "medical treatment 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* at 844 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

The standard for deliberate indifference includes subjective and objective components. *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001). When considering such a claim, the Court should ask both if the officials acted with a sufficiently culpable state of mind and if

8

the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992). "[T]he subjective intentions of prison authorities must be demonstrated by objective manifestations of such intent, and cannot be proved by factually unsupported, conclusory opinions of the court or of the prisoners or their representatives." *United States v. Michigan*, 940 F.2d 143, 154 n.7 (6th Cir. 1991). In examining deliberate indifference to medical needs, the Sixth Circuit has stated:

> Officials may be shown to be deliberately indifferent to such serious needs without evidence of conscious intent to inflict pain. However, the conduct for which liability attaches must be more culpable than mere negligence; it must demonstrate deliberateness tantamount to intent to punish. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.

*Horn by Parks v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) (citations omitted).

The objective component of an Eighth Amendment deliberate indifference claim is governed by "contemporary standards of decency." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

> [O]nly those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation. A similar analysis applies to medical needs. Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious."

*Id.* at 9 (citations omitted).

### A.

As the deliberate indifference standard clearly dictates, the subjective prong of the test requires that the plaintiff demonstrate that the official, "acted or failed to act despite his knowledge of a substantial risk of serious harm" to the inmate. *Terrance*, 286 F.3d at

843 (quoting *Farmer*, 511 U.S. at 842). The only documented expression of Abney's concern about asbestos exposure is in a "request to see staff" form dated October 26, 2009. Personnel responsible for screening Abney's request form clearly stated on it that, because Abney already had an appointment scheduled in the near future, he should raise his concerns at that time. He did not.

  Nurse Washington saw Abney only four days later on October 30 and there is no indication that Abney ever brought up the topic of asbestos or the possibility of being screened for exposure at that time. Moreover, Abney received an abundance of care with regard to chronic knee problems, hemorrhoids, skin problems and other issues. He had numerous and frequent contact with Nurse Washington and many other care providers as well. No creditable evidence suggests that Abney raised the subject of asbestos or asbestos screening with Nurse Washington. Without knowledge of a serious medical problem, a care provider, such as Nurse Washington, cannot act with deliberate indifference. *Terrance*, 286 F.3d at 843. Abney's claims against Nurse Washington must fail for that reason alone.

B.

  Abney alleges that Nurse Washington was deliberately indifferent to his serious medical need by denying him the "right" to be examined for exposure to known carcinogens after repeatedly reporting his exposure. Abney states in his "Factual Material Issue's In Dispute of 42 U.S.C. 1983 Complaint" that, "…after continuous attempts to provide medical with request to evaluate blood levels and to conduct test to examine…Abney of results of any exposure to the lead Paint materials, or Asbestos, he was deliberately ignored. …KSR Medical denied Mr. Abney Medical Attention to either Prove or Disprove his claim of being Exposed to the

chemicals, and as to whether contact did in fact occur."

Even assuming that Abney was in fact exposed to asbestos and Nurse Washington was informed of this, there is currently no recommended or strongly supported screening protocol for asbestos exposure. This is consistent with statements made by the Agency for Toxic Substances and Disease Registry in a report from 2001. This report stated, specifically with regard to the question of whether or not there is a test to determine a person's exposure to asbestos:

> A thorough history, physical exam, and diagnostic tests are needed to evaluate asbestos-related disease. Chest x-rays are the best screening tool to identify lung changes resulting from asbestos exposure. Lung function tests and CAT scans also assist in the diagnosis of asbestos-related disease.

Chest x-rays are, therefore, the most common and useful tool with regard to detecting asbestos related disease. But chest x-rays only detect signs of asbestos-related disease—not exposure to asbestos. A chest x-ray at or near the time Abney filed his request to see staff on October 26, 2009 would have had no diagnostic or therapeutic value. He had just undergone a chest x-ray on September 11, 2009—about six weeks earlier. Findings of that chest x-ray were "normal." Nurse Washington discussed this finding with Abney on September 23, as well as the findings of the lab work, which were "unremarkable." Since a chest x-ray is only useful to visualize the onset of asbestos related disease, which can take decades to develop after exposure, another chest x-ray in October would have not been medically appropriate or beneficial.

Abney also underwent two x-ray studies on November 5, 2010; a portable lumbar spine and a portable thoracic. While neither of these studies was directed at detection of asbestos related disease, the thoracic x-ray was of Abney's chest region, the radiologist would have commented on and any abnormalities indicated on the films.

Abney also underwent frequent lab studies, spanning from just after he started on the

11

work detail until only a few weeks before his release. Almost without exception, Abney's labs were normal during this entire time and his white and red blood cell counts always came back normal.

C.

In his request to see medical staff submitted October 26, 2009, Abney only wrote that he had possibly been exposed to lead paint dust. He never raised this issue when he saw Nurse Washington on October 30. Nurse Washington is shown, once again, to be without knowledge of Abney's complaints, and once again the subjective component of the deliberate indifference standard cannot be satisfied. *Terrance*, 286 F.3d at 843.

Nurse Washington saw Abney frequently and Abney never displayed any symptoms of lead poisoning, which include: abdominal pain and cramping; aggressive behavior; anemia; constipation; difficulty sleeping; headaches; irritability; low appetite and energy; and reduced sensations. More importantly, a complete blood count can be a useful tool in diagnosing lead poisoning, and Abney's complete blood counts were always normal. Abney's red blood cell count and white blood cell count remained within normal limits from March of 2009 through November of 2011. Washington had no medical basis for believing that Abney suffered from lead poisoning.

D.

Finally, Abney never told Washington he was having problems with dizziness and blurred vision. Taking Abney's request to see medical staff as accurate, Abney requested to have his eyes checked; he checked the box for "Eye Doctor" as the department to whom he was submitting his request. Further, Washington saw Abney for the last time on April 27, 2010,

12

Abney's request is dated July 27, 2010. Without knowledge of a serious medical problem, a care provider, such as Nurse Washington, cannot act with deliberate indifference. *Terrance*, 286 F.3d at 843.

In his amended complaint, Abney alleges that he was denied examinations for reported dizziness and blurred vision from October of 2009 through February of 2011. Abney was seen frequently by medical staff and made numerous requests to see staff; yet there is but one instance in Abney's medical records where he complained to anyone about dizziness and blurred vision except for the request to see staff form, and that was during his annual physical exam on November 3, 2010. Abney stated that he had experienced blurred vision and had not had an eye exam for four years. Nurse Harrison ordered an appointment be scheduled for Abney with the eye clinic.

## IV.

Abney, in his Amended Complaint, alleges that Dr. Kemen was responsible for his medical care. Dr. Kemen had no direct involvement with any of Abney's medical care and, in fact, Dr. Kemen's name does not appear a single time in Abney's medical record. Abney appears to have based his charge of responsibility on Dr. Kemen's position as "head of medical." Abney alleges that he filed grievances concerning his desire to be screened for exposure to carcinogens and was not, and as a result his vision and breathing have worsened.

Because Dr. Kemen had no personal involvement with Abney's care, the allegations against Dr. Kemen can only be framed as one sounding in *respondeat superior*. However, the Court has already stated a prior Memorandum and Order (DN 19), "*Respondeat Superior* is not a proper basis for liability under § 1983." *Id*. at 6 (quoting *McQueen v. Beecher Cmty. Schs.*, 433

13

F.3d 460, 470 (6th Cir. 2006)). For supervisory liability to attach, a plaintiff must prove that the official 'did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on.' *Loy v. Sexton*, 132 Appx. 624, 626 (6th Cir. 2005) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). Therefore, liability of a supervisor under § 1983, must be based on active unconstitutional behavior and cannot be based on a failure to act. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998)).

To establish liability of a supervisor, a plaintiff must show that the supervisor at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of his subordinates. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). This Abney cannot do, because there was no unconstitutional conduct on the part of Dr. Kemen's subordinates. *McQueen v. Beecher Community Schools et al.*, 433 F.3d 460, 470 (6th Cir. 2006). Abney's allegations against Dr. Kemen based on his supervisory capacity must fail as a matter of law.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion for summary judgment is SUSTAINED and Plaintiff's claims against Frederick W. Kemen and Roy Washington are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendants' motion to amend the scheduling order is now MOOT.

cc:     Counsel of Record